Will the attorneys who are going to argue this morning please approach the bench and state your name and advise the panel of how much time you would like to present your arguments. Mr. David Maxey on behalf of Defendant Stanley Foam Corp. I think 10 minutes and then a 5 minute rebuttal. Very well. Jonathan Piper for the Plaintiff's Faculty. I guess I'll ask for the same 15 minutes. Very well. Thank you. Mr. Maxey. May it please the Court. Counsel. Here on behalf of Stanley Foam Corp. This case deals with the interpretation and application of the Telephone Consumer Protection Act. And we're here today asking that this Court reverse the trial court's entry of summary judgment against Stanley Foam Corp. We believe that the facts and the law support reversal because there are numerous issues of material fact that the trial court overlooked regarding whether Stanley Foam had retained B2B, a third party. What's the material fact on that point? On the fact of whether they had, okay, on that point there is, I'll step back. Stanley Foam had an independent contractor, bookkeeper, marketing guy. But he worked for the company. Mr. Christie. Right, he worked for the company. He worked for the company. He was an independent contractor, yes. But he was given the authority by Mr. Durain to engage in this marketing campaign. Yes, he was. And Durain was aware that Christie was dealing with B2B, correct? Yes, correct. So that part of it, there's no, no one was a stranger to anyone else, correct? In that situation, that's correct. Okay, so where are we going with this? So what happened was Durain of Stanley Foam gave Christie a directive that said this is to be limited. He said if we are going to market this product through this facsimile, it's going to be limited to three states. The tri-state area directly around the company's operations out in New Jersey. So it was limited to New York, New Jersey, and Connecticut. And parts of Pennsylvania. Well, initially it was parts of Pennsylvania, but after another conversation, they both agreed that it would be limited to those three tri-state area. But then what the instruction to Christie was, move these 6,000 west. No, that's, we, first of all, we believe that's disputed. We believe that document is disputed. We believe that also we, as Christie was an independent contractor, he could not authorize going beyond the tri-state area. Okay, and there's no evidence in the work. And the limitation on Christie was, according to your version of life, was Mr. Durant the president. Correct. So at least internally, your position is Durant gave, quote, complete authority to Christie, but that complete authority was limited to a tri-state area. Correct, correct. But it's fair to say from the record, I think, that between Christie and B2B, there was no such limitation. That we don't know. Well, we do know that Ms. Abraham or Abramson. Right. Right? She said that she contracted with Christie, told Christie what she was doing. Christie told her to send 6,000 faxes and start from point A and move west without limitation. Correct? Incorrect. Incorrect. Incorrect. Christie, there's no evidence in the record that Christie ever dealt with Abraham. Christie dealt with an individual named Brennan or Wilson. From B2B. No, from McCaw. They were a company in McCaw and they were a sales arm of this Romanian company that was McCaw. So was it your contention that B2B sent these faxes without any authority or without any direction? Well, there was a relationship between B2B and McCaw, yes. And McCaw was part of Christie's realm of authority. What we know is that Christie sent faxes to McCaw. We don't know the extent of authority. We don't know anybody. There's no evidence in the record that anybody from McCaw ever asked Christie, what's your role in the company? Do you have the authority to do this? There's no evidence from that side. Why would you need that when the president of the company is saying affirmatively, I gave Christie complete authority? To do a fax advertising campaign for this tri-state region. And on May 4th, consistent with that authority, Christie sent a fax that said we want to send 5,000 limited to these three states. That was on May 4th. And then where did the evidence come from that said, and we were told to send those faxes and when you send enough, continue going west? That came later. From whom to whom? Well, that's a disputed issue of fact here. Well, what's the dispute? That's what I'm trying to figure out. Because that document is inconsistent with all the other. The document came from whom? The document that's, I believe it's B2B22, there is a fax check. So there is a fax check at the top and underneath it is a document that looks like it's overlayed and it has typewritten instructions that makes no sense in light of everything else Christie had done. Christie sent everything by handwriting except for one small version at the end. On the July 27th where he typed in, there was a type in adding a special. Everything else from Christie came from handwritten instructions. In fact, all of his instructions were already given to the Macao people by the time that May 25th fax with the check was sent. And what's significant here, well there's a question of fact for the jury we believe, is that Ms. Abraham admits in her deposition that she's the one that gives payment instructions. So she gives payment instructions and then all of a sudden, two days later, there's this fax with a check and then underneath it a typewritten memo which states the terms of the deal, which is something that B2B, which Abraham says she does, which she had just done two days before. Was that the $277 check? Yeah, the $277 check. Is Macao a Romanian company? Pardon me? Is Macao a Romanian entity? I believe it's a Romanian entity, yes. Tell me why all of this is relevant when the statute seems to only ask two questions. Were these fax transmissions on behalf of Stanley Fulm and did they advertise Stanley Fulm's product or service? That's a good question. Oh, there's a question about that? That's right, that's right. You're denying it was not sent on behalf of Stanley Fulm? The Tri-State area were sent on behalf of Stanley Fulm. That was the directive. Outside of the Tri-State area? Outside of that was not sent on behalf of Stanley Fulm. So you admit you're liable for what was sent in the Tri-State area? Yes, yes. Just outside the Tri-State area? Right, for purposes of, yes, absolutely. And those sent outside the Tri-State area were sent by B2B, correct? Correct. And Abraham said that they were sent on the direction of Christie to send X number, and then when you reach that number, go west, meaning outside the Tri-State area. Right, Abraham had no direct contact with Christie at all. Okay, but she did that on direction from whom? She did that upon that document that she received. From whom? Well, we don't know. That's a question of fact. Who was the check from? The check was from Stanley Fulm, from Christie. Christie sent that check. Nobody asked Abraham where she got that instruction to go west? She says that it came with that check. And where did she get that check from? The check came from Stanley Fulm, from Christie. But underneath that document, if you look at the sheet that they provide, okay, of the computer, she basically takes a screenshot. And if you look to the right column on that screenshot, those documents have been modified. It says last modified date. Last modified date is that date. So they very well could have sent that document, attached that document underneath it. Isn't the record such that Abraham says, I sent the faxes west because I had this check from Stanley Fulm on this form that was sent to me on behalf of Stanley Fulm. Isn't that a fair reading of her testimony? This didn't come out of thin air, did it? That she sent them west? That's right. She sent them west based upon, no, from our perspective, it's a question of fact. Because B2B did this all over the country. Wait, wait, wait. Question of fact what? Of the authority to send them west? Well, first of all, that's a second question, is whether Christie had the authority, even if that is true. Even if that document came from Stanley Fulm, whether Christie had the authority. But the second issue we have is that that document looks like it's been doctored, number one. Who says it looks like it's been doctored? I mean, on its face, it's different than all the rest of the documents. It's a totally different format than the way that Christie did all of his previous documents. And it's a fax check, and underneath it there is a white sheet with these all-capitalized instructions. And it looks, it's inconsistent with what Christie had done. And on May 4th, Christie already sent instructions saying, well, we're going to do the Tri-State region. It's your contention that no one knows where that came from? Our contention is that they have not proved where that came from. That likely came from internally one of those people within the company because they were already being suited this time. So they were likely. Either McCaw or Abraham. Because on, I'm not sure, but on that sheet it says the last modified date, and it has the date that that document was sent. So if this case was before a, in a trial, venture jury, your defense would be, yes, Abramson got this document. Yes, she had it. Yes, she acted pursuant to what it said. But we didn't send it. We don't know who sent it. That would be one, yes, that would be one of the defenses, yes. We don't know who sent it, and we don't know, yeah, where that, that second, that underlying part of it. The check was sent. That's a Stanley film check. But underneath that check is a written, is a white paper, a check is a, a check is a check. Yeah, I did. So that's one of it. Yeah, that's part of it. Yes, is that, that, that check, that underneath, the material underneath that check is inconsistent with all the other documents. It's unclear that it came from Christie. Unclear to whom? You or to? To a trial effect. To anybody. If you look at the documents, it's inconsistent with the others. It's inconsistent with what he said on May 4th. And is there anything in Abraham's testimony that would indicate that it could have came from Idaho or some other company? Well, I appreciate that. Abraham says that she understood that the company had on May 4th, they had sent a fax which said limited to the tri-state region. And then she said she got this one. And she doesn't know why. And they would have changed their mind or any, why they would have decided to go from the East Coast all the way to the West Coast until the 6000 ran out. She doesn't know why. She doesn't know why, where it came from or anything. In her testimony, she doesn't. She just knows that it's on her. Well, this is apparently based upon her dealings with Christie. Apparently it came from Christie. It's her testimony. That's why she did it. Her testimony, she did it because she believed it came from the Christie Stanley phone. But she doesn't, had no contact with Christie herself. Had no contact with Christie herself. Everything came through McCaw. Although she was, she had that computer at her home and sent things through her fax. So, boiled down, your question of fact is, although she thought it came from Stanley phone, your defense would be, we didn't send it and we don't know where it came from. Yes. That's one of our defenses. And the other one is that Bob Christie didn't have the authority to authorize it going west of the tri-state area. Correct. Even though your president said he had complete authority. With the proviso that it's limited to these three states because of our bulky items. It makes no sense. They had big bulky items. They sold foam and upholstery supplies. They wouldn't be sending things to Illinois. It's inconsistent with the business practice. So even if the check and the inconsistent language on the face of that document were arguably sent by Bob Christie, your second defense would be he didn't have the authority to send it because he exceeded the scope of his authority. Correct. And he didn't have apparent authority because there's nobody there that's testified that he had apparent authority. Miss Abraham had no contact whatsoever with Christie. So how would she know what his authority was in the company? She doesn't. Well, she's admitting she had authority to send the tri-state area faxes. Well, we admit that. She doesn't admit it. She doesn't have any idea. We admit that we limited the scope of his authority to the tri-state. She has no basis whatsoever to say where she had authority because she never checked. After Saris, it doesn't say anything about implied authority anymore. Right, right, right. But you still have to show on behalf of liability. And what does on behalf of mean? So what do they do with those 4,300, 4,900 pushed out faxes? That goes to the source, and the source is B2B and their maliciousness. Why was that not considered on behalf of Stanley Fulmer when it was their advertisement? Because B2B was looking to make their own buck. They didn't care. They were not doing that on our behalf. B2B was looking to make as much money as they could. They didn't care how they made it. So for them to send these faxes out was nothing. They just made extra money. They didn't care for $250 from Stanley Fulmer. And the truth in the advertisement says buy my Stanley Fulmer product. Well, on whose behalf would it be if it wasn't Stanley Fulmer? On their own behalf. They were doing that on their own. It was outside of the scope, Your Honor. They became the sender? For what? They became the sender? In that circumstance, under these cases that we've cited, there's questions of fact, because in all those cases where there's a question of fact so far, now, understandably, Illinois does not address it. You're going to be the first court that has this opportunity. But under the other cases, the SynQ case, the Bridgeview case, these faxes were sent beyond their authority. They were given a certain, especially Bridgeview. In that case, they were limited to TeraHot. B2B or whatever the faxing company, I think it was B2B, went in, and they sent them way beyond Indiana. And although they advertised this TeraHot business, the court said, well, it's not on behalf of TeraHot, or this business of TeraHot, because they only limited it to this particular area, and you went way beyond that. So it's not on behalf of them. Even though it advertised their products, it's not. Same thing with SynQ, question of fact. And the same thing with Saris. Those faxes advertised Dr. Saris' office, but they went outside the radius or outside the authority. If you go back to the original part of this case, there was motion for summary judgment that was granted, and that's what you're trying to get reversed. Yes. So we're way beyond where that marker was. That was the beginning. Motion for summary judgment was granted. Correct. Because in the meantime, all these other things have occurred. But what's the effect that they have on this? We still don't even know exactly who the sender is, although it seems to be the attribute could be to the entities themselves. Counsel, let me explain to you what I'm having problems with. For Christy to get complete authority but limited complete authority, that simply is those two terms are inconsistent. You have complete authority to send these faxes out, and you're coming in and saying, well, it was complete authority but only within the tri-state area. It would have been unnecessary for him to say complete authority in the tri-state area. He could have simply said it in the tri-state area. But that's not what's said. And he dismisses it. I disagree. For complete authority. I do. I agree with that, but I disagree about what complete authority means. Complete authority with a proviso. So the complete authority is you're going to get the advertisements, you're going to review what they say, you're going to go ahead and edit whatever advertisements, you're going to have communication with B2B, whoever it is, and with these people, you're going to arrange for the deal, but it's going to be limited to these three states only. So he had complete authority, Your Honor, except that it was limited because the business did not call for any further than that. They sold big, bulky items that made no sense to them. That's what Doreen said. It was like one of these. He said, yes, go ahead and do it. And then Christy agreed to it. And so then that's why that May 25th fax makes no sense because it's inconsistent with what they'd already agreed to. It's inconsistent with May 4th, and we believe the jury should have an opportunity to look at this evidence to decide who is telling the truth. And they don't have anybody from McCaw to testify as to any conversation with Christy, how it was changed. They have no testimony to say that, yes, he authorized it. They have no testimony on their end because Ms. Abraham had no contact with Christy or with Doreen. But what they do have are some faxes that were sent on behalf of Stanley Foam, and they were advertising Stanley Foam's products or services. And that's your role. That's your role today is to determine what on behalf means. Nobody has determined that definitively. And as I said, those cases, Sarris, those went way beyond the authority. Question of fact, even though they advertised Sarris's products, they went outside of the area. The court said, as a question of fact, whether those were on behalf of Sarris. Even though, yes, they advertised Sarris's products, the court said, but that's not the end of the inquiry. Just because they advertised Sarris's products and just because Sarris put it in motion, meaning that Sarris contacted B2B, the fact that it went outside the authority, that's a question for the jury to decide. And the same thing with CQ and the same thing with Bridgeview. But in that case, they were reversing the motion for summary judgment that had been granted, so they had to send it back and let the jury decide. I suppose they could have entered summary judgment, but send it back, let the jury decide. It's a little different here. A little different, but it's the same principle, sending it back for a jury determination. That's what we're asking. We're asking that this be sent back for a jury determination. But in the meantime, yes, on behalf of, is an issue that this court has to grapple with, just like those other judges have, as I've explained in my brief. What does on behalf of mean? Does it mean just because I authorize somebody to send a fax, that all of a sudden they can just send it to wherever? And we say no. We're asking that the court say no, and that the court look at this. We wouldn't be in a position of saying on behalf. If you're saying on behalf of is a question of fact, then it would not be our purpose to say on behalf of is this, because that question of fact, you claim, is to be decided by a jury. I mean, you're right. I mean, you can't have it both ways. Well, I mean, but now what I'm getting in the problem that Justice Neville is having is that while there was authorization to send these to the tri-state region, and now they went beyond the tri-state region, so those are on behalf of this company. And we're saying no, it's not, because we limited the authority to that tri-state region, and we don't know why that document, that May 25th, we think that's suspect. And even if it's not suspect, Christie didn't have the authority to go beyond that, and there's nobody in this that could testify that Christie had the authority to go beyond his express limitation that was set by Stanley Foam. They said tri-state region, he agreed to it, and there's no testimony from anybody at McCaw that they understood that he had apparent authority otherwise, because Abraham had no contact with them. For Abraham to say, oh, yeah, I thought they had authority, so what? She's not even involved. Well, you would agree, though, if it is a question of fact, that a fact finder could sit there and say, yes, Mr. Durain, we believe that you gave him, quote, complete authority, but we do not believe that you limited it to the tri-state area. Yes. Right? Yes. That's your question. Yes. Yes. Simply on the whether Christie exceeded the scope of his authority. Yes. Yes. Yes. If that document is no question of fact on that, then yes, that's correct. That's what we're saying. With all these moving parts, there's been no interlocutory efforts whatsoever while this has been going on? No, not that I'm aware of. Okay, we've exhausted all your time with our questions. We'll give you some time for rebuttal if you need it. Thank you. Thank you. Mr. Piper. May it please the court, counsel. It's obvious that you've read the briefs very carefully, so I'd be happy to start with asking any questions. So why is there, in your judgment, no question of fact? Well, there's no material question of fact.  about exactly what he said to Mr. Christie, so I think we have to assume that he did put this three-state limit for purposes of a summary judgment motion. So you're saying summary judgment was improvidently granted? No, because that's not a material issue of fact. It doesn't really matter what Duran said to Christie, given that he did authorize him to send the faxes. That would either give Christie inherent authority to do what he wanted, or in negotiating it, or apparent authority, because he was doing all this out of the offices of Stanley Foam, sending checks that were made out by Stanley Foam, using their fax machine to send in the information. But a principal can limit his agent's authority, correct? Yes. And Mr. Maxey seems to be arguing that Duran gave Christie authority to send faxes, let's say. Right. But he limited that authority to send faxes only to the tri-state area. So if the argument goes, tell me what I'm missing. If he said only send faxes within the tri-state area, and Christie authorized faxes to go to the Midwest, he exceeded that authority. And therefore, there shouldn't be vicarious liability, I think is the argument. Well, that is the argument. What's wrong with that argument? It doesn't work either under the law of vicarious liability, and it assumes that vicarious liability is the standard. So, first of all, SIRIS says you don't look at vicarious liability. The question is just was it on behalf of, and that's a looser standard than vicarious liability. So the mere fact that the goods and services of Stanley Foam were advertised could be enough to establish that they were the sender, especially here where it's undisputed that Stanley Foam did hire a broadcaster to send 6,000 faxes. And wherever they were sent, the 6,000 faxes, even if they were all sent to New Jersey, each of the 6,000 faxes would have been in violation of the Telephone Consumer Protection Act. Well, they've admitted New Jersey, the tri-state area faxes. Right. But in fact, all 6,000, they set out to do 6,000 violations of the act. They didn't know it was a violation, but they set out to send the unsolicited faxes 6,000 times. Okay. So for purposes of this lawsuit, what does that do for you and us and them? Well, it establishes that the 6,000 were sent on their behalf. They advertised their goods and services. It was advertisements for their business. It was done at the request of someone acting on their behalf. So is your argument that because they've admitted sending the tri-state faxes, they should be liable for sending the Illinois faxes? Right. They admit that they hired a broadcaster to send the faxes. The broadcaster did what they were instructed to do. The broadcaster had no reason to doubt that Mr. Christie was doing what he was supposed to do. And that's enough to get, even under vicarious liability, that's enough to get you a parent authority. I would note also that there's a ratification argument because the faxes were sent in two sets. So after the first set went out, Mr. Christie updated the ad a little bit and had it sent a second time. And then at that point, a lawyer in Ohio said, hey, these faxes are in violation of the federal law. And Mr. Duran did not at that point investigate and say, hey, Christie, why are you sending these to Ohio? There's no record that anything was done at that point to complain to B2B, the fax broadcaster. Is there anything with the FCC that's still implicated in this case? Do you mean proceedings about Stanley Foam? There's nothing going on with the FCC to my knowledge. So your argument is once they engaged in this fax campaign, regardless of whatever Duran told Christie, the fact that they engaged in that campaign and paid for it, they're liable for every fax that was sent. Correct. It would be arguably a different case if the fax were like Saris, where the defendant, if Mr. Christie said, I never said go outside the tri-state area. I said New Jersey, Connecticut, New York from the get-go, and that was always my instruction. Saris says that could be a question of fact. In other words, there's a dispute between the broadcaster and the advertiser about what was communicated. But here it's undeniable that the advertiser, through Mr. Christie, said keep rolling it out west until you run out of the 6,000. That's where Mr. Maxey's argument comes in, that my agent exceeded his authority, and therefore I, the principal, Stanley Foam, should not be liable for my agent's activities outside the scope of his authority. That's not a legitimate argument? No, because, again, even under vicarious liability, if I put some limits on somebody but send him out into the world to do business and he goes outside the scope of authority and the people he's dealing with have no reason to doubt that he's actually representing me, that's apparent authority. I've dressed him up, I've given him my fax machine to do business with, I gave him a check, all that stuff. Then if he screws up, you're responsible for that because you put him out there in the world doing that. That's the idea of apparent authority. So the apparent authority, I hate to use this word, trumps the direct authority? Correct. And he did have direct authority to be negotiating with B2B. There's no dispute about that. You could actually call it inherent authority because once you're bargaining with a fax broadcaster to make up a deal for a fax broadcast, exactly what the scope of the geography will be is sort of one of the necessary things. It's like he had inherent authority to mark up the ad and add additional specials to it and so forth. What about this question of fact that Mr. Maxey says, as far as B2B was concerned, they weren't sure or don't know where this document came from that had the check attached to it or faxed? Well, what's true is that these are business records. Ms. Abraham was not testifying. Oh, yeah, I remember Christy. He had a deep voice. He sent me these letters, et cetera, et cetera. But they are business records, and her testimony is very clear on that. And so the language that says roll it out to the entire USA has a fax line from Stanley Foam. It's with a check made out by Stanley Foam on their bank account. And his argument is, well, usually he handwritten his faxes and this one's typed. But then a couple of months later, he sent another fax against Stanley Foam Company that's got the same typeface down at the bottom. And the fax says, you know, the only change in our ad is this. Don't send it to our competitors and so forth. So it's an awfully thin argument to say, well, how do we know this is a genuine document, even though it's in her business records? If that were the standard for summary judgment, the only way you could get summary judgment would be, you know, that somebody admitted everything in your complaint. Because you could always say, well, how do I know this is really the declarant's affidavit? Maybe page three was substituted. This document could be doctored. No, you have to come forward with some actual evidence, and there's no evidence to suggest that this is not what it purports to be. And Ms. Abraham testified to that, too, that looking at her records, she couldn't see anything that would raise a doubt in her mind about, Mr. Christie was on the up-and-up. He wanted these faxes. She did what he ordered her to do, and they had a chance to cross-examine her and couldn't raise any doubts in her mind. Well, I think I've covered in answering your questions the main points I was going to make, but I think Judge Atkins wrote a very thorough, thoughtful opinion, looking at different legal standards that might apply, and saying what I'm saying, which is you can just go on by the on behalf of. Even if you go to the Supreme Court, we would win as a matter of law. Well, your argument on our behalf, to me, is somewhat troubling, because I suppose someone could hijack a Stanley form and cause B2B to send out violative faxes. And wind up getting sued, and then they come in and say, we never did this, we never authorized this, we never did anything. And then if the on behalf of argument is, but wait a minute, I have this piece of paper that says, advertise Stanley Foam products at five cents a sheet of foam. That's on behalf of Stanley. It wasn't on behalf of Joe Below Zero Foam Company. Yeah, I'm glad you raised that question, because I didn't address that. That's sometimes referred to as the sabotage theory, that Pepsi wants to annoy all the Coke customers, so they start sending out junk faxes for Coke, and then Coke gets called into court saying, well, you violated the TCPA. Wholly apart from the fact that I've never heard of that actually happening in reality, that would not apply under the argument I'm making, which is that once you've actually hired someone to send faxes to you, that is not sabotage. Here there's no question that this was one of Stanley Foam's competitors. The undisputed evidence is that Duran wanted to send faxes. He told Christie to go send faxes. Christie did hire the broadcaster. Stanley Foam did pay the broadcaster. So there's no sabotage here. There's certainly no factual basis to suggest that Mr. Christie was trying to do a dirty trick on Mr. Duran. This is the advertisement that Stanley Foam wanted to have sent on its behalf. But your argument seems to foreclose any defense at all by the defendant, whoever that may be, of saying, but I didn't authorize this. And their statement of lack of authorization is that internally I told Christie, don't go beyond the three-state area, tri-state area. So you're saying it's an absolute liability case, basically, that once it is started, you're responsible for whatever happens afterwards. Not once it's started, at least. The law is not that extreme in the existing case law. So what Palm Beach says is if you start it, if you design the ad, but you say, wait, like I believe in Saris they said, send me the list of the people you're going to, or that was a different case, that was Wagner. There are often little hiccups that can create issues of fact. For example, I'm all ready to go, I got my check ready to send you, but can you please send me the list of who you're going to send the fax to? And in the meantime, they start the faxing. And then that guy says, well, I didn't really pull the trigger. I wanted to see the list of fax numbers. Well, that creates a material issue of fact. But there's nothing like that here. Between Stanley Foam and Mr. Christie and on the one hand, and Carolyn Abraham on the other, there was no gap. Christie said, here's what we want, and that's exactly what the broadcaster did. It's not like, well, I was still making my mind up, and they started sending the faxes, you know, without my giving them the final approval. That's what the Palm Beach and Bridgeview type scenario is. And in Bridgeview, there was no documentary evidence as to exactly what the order was that they made, or the witness testified, no, I told them I only want 200 cents to tear a hoat, regardless of whether that was credible. He was very firm that he had never told them to send thousands of faxes. But again, there's no dispute that what Abraham did is exactly what Mr. Christie told her to do. That is, he told her, send 6,000, roll it out west, and that's exactly what she did. Let me explain why the liability should be on Stanley Foam as a policy argument. So I understand what you're saying. From a policy standpoint, it's a little unfair to put so much priority on the advertiser as opposed to the broadcaster. But that's what the FCC has said it wants. They want the advertisers to be the final say in making sure that what happens is compliant with the law. They want the broadcaster to be only secondarily liable. In fact, some of these broadcasters are just like a fax machine on the Internet. You just plug in the fax numbers you want to send it to and upload an image, and then they fax it for you in a mass broadcast. The FCC is saying, well, it should really be the person that's ordering the faxes that has the ultimate responsibility to make sure everything goes according to law and according to the way they want it. So you can't sort of evade liability by saying, okay, broadcaster, you do all the dirty work, and I won't be liable. You're the one that will be liable, actually. It's the opposite. The only way a broadcaster is liable is if they do the things that B2B did in this case, which is help design the ad, then they can be secondarily liable. But the primary liability rests with the advertising company. Are they referring to the advertiser as the sender? Yeah, they've said this. Generally, the sender is the person whose goods and services are advertised in the fax, and that's both in the regulation and in the interpretation. So it's, in your mind, strict liability on behalf of the sender that once you affirmatively engage in fax advertising, you're going to be responsible for any violation? Right. Once you've actually pulled the trigger and said go forward and do it, the same as if Mr. Christie had sat down at the fax machine at Stanley Foam and said, you know, I ran out of phone numbers in New Jersey and New York and Connecticut. I'm going to keep adding phone numbers in Pennsylvania and Ohio. There's no question in those circumstances that Stanley Foam would be responsible. Or if it were Mr. Durant's secretary that was sending him the mail. In that situation, Mr. Mackey's argument would be there's a fact question of whether Christie had the authority to send him further west. Right. He exceeded my authority given to him by the principal. My agent exceeded his authority. So your argument is that doesn't work under this statute. Correct. The test is on behalf of and under both circumstances where Mr. And in the hypothetical I'm giving, I'm assuming that Durant said Christie sent 6,000 faxes, but sent them to the tri-state area. Christie had complete authority, but here's this limitation. Which is your fax. And if Christie did it himself, then Stanley Foam would be on the hook, and they can't evade that by simply hiring an outside company to do it. That's not Mr. Mackey's argument. His argument is that Christie exceeded his authority by allowing faxes to be sent beyond the tri-state area. As I see this whole thing, if Durant didn't say I gave him complete authority, if he said I gave him complete authority and stopped right there, there would be no argument. Right. He's creating the issue of fact, he believes, by saying, but I limited that complete authority to the tri-state area. I never gave him authority to go beyond that. And your argument seems to be, but the B2B company was acting on the apparent authority of Christie to authorize those faxes, which made them on behalf of Stanley. Well, one way to look at it is, let's take the TCPA out of it. Suppose Durant goes to Abraham and says, hey, I paid you $277 for 6,000 faxes, and I found out a bunch of them went to Ohio and Illinois. I want $125 back. I never ordered those ones. I think this would be a good defense to that contract claim as a matter of law, that she was just doing what his guy said. How was she supposed to know that Durant and Christie had some conversation in the hallway? Christie didn't tell her about that. Durant let him make out the check on his behalf. Wouldn't the principal have the argument that that contract was not entered into with my authority? Not under apparent authority. That's what I'm saying. Your argument is apparent authority trumps vicarious liability where the agent exceeds his authority. Right, or inherent authority if it's essential to the transaction, which I think it is here to negotiate where the faxes are going to go and that sort of thing. And there's some case law saying that secret limitations that nobody knows about aren't binding on. You know, you might have a contribution claim against Mr. Christie for breach of fiduciary duty or something if he really screwed up, but that doesn't mean that the person that did what they were told to do is somehow violating their contractual obligations when they're just doing what the contract said. Okay, do you have anything else you'd like to add? No, I think that covers it unless anybody has a question. Well, we appreciate it. Thank you. Thank you. Mr. Mackey? Thank you. Maxey? Thank you, Your Honors. I'll just go backwards. We get to the question of apparent authority here, and that is a clear question of fact in this case, whether there was apparent authority between Doreen Christie to McCaw to Abraham. Abraham is completely divorced from this transaction. This is what this Court has to remember. There's no evidence. Read her deposition. It's in the record that she had any communications with these people, and they didn't put any evidence on to show that the people at McCaw, Mr. Brennan and Mr. Wilson, had spoken anything whatsoever with Christie to find out his authority. And that's important because Christie was a part-time bookkeeper, and he was an independent contractor at the company. These cases where they say, well, he had inherent authority, those cases apply when it's somebody in a position like Mr. Doreen who tells you to do something. Then, yes, you can rely on his authority. But if you just send a fax, unsolicited fax to a company, a mailroom guy picks that fax up, says, hey, I'm going to advertise 1,000 faxes for you, and he begins to negotiate. He's told, okay, you can do this, but just keep it limited to this area. And he begins to negotiate with some other company. He doesn't have apparent authority. They have to go behind him. They have to contact somebody higher up in the company to find out, hey, what's your authority here? Does he have authority to do this on behalf of me? The cases of apparent authority lead to a question of fact here. But one thing we can certainly say is Ms. Abraham has no role in whether this company had, whether Christie had apparent authority or not because she never dealt with the man. He dealt with these other two people. And so then we go to the question of secret limitations not binding. Again, that doesn't apply in this case. This is only a secret limitation. He was told, you're authorized only to enter into, you're authorized to go ahead and handle this fax advertising, but limit it to the tri-state region. So yes, you're given complete control, as I explained. You can negotiate it, get the deal set up, but it's going to be for these three states because we can't afford any more than that. We can't afford the shipping costs. Well, Mr. Piper was talking about secret limitations between the agent and the principal, not being binding on a third party who contracts with the principal's company. Right, and this was not necessarily a secret limitation. He was given express authority to negotiate with the tri-state region. Well, it was secret between Stanley Foam and their employees and agents. It was secret within that company to the rest of the world. Wow. Because apparently nobody else knew about this tri-state limit. Well, you're correct, but they did because on May 4th there was a fax that was set that said limit it to these three states. Now, later on that suspicious fax comes through that says to go start at one end and start going the other direction, but that's disputed, and also the question of fact is whether Christie had authority to do that, even if he did go beyond that. It's still a question of fact. And we're not raising the idea of vicarious liability. We're accepting the fact that it's direct liability here if it's on, if the fax is on the behalf of Stanley Foam and advertises its goods and services. You need both. The question is what does on behalf mean? What standard does this court apply? And we say, we advocate the totality of circumstances, which is what these other courts have looked at, and that's a question of fact for the jury. It can't be decided by the court as a matter of law. And what Plains is advocating is strict liability, as you've indicated, that if they're liable and we can't limit the authority of sending them to the tri-state region, and that just because we set it in motion that we're strictly liable for everything beyond that, then we're advocating the totality of circumstances test, and that you look at the totality, then what was the control here? There was no control. B2B went out. There was a limitation. And then the question of fact about that document. And the question of fact of Christie's parent authority, these are questions for the jury, Your Honor. Another issue is that you had asked about Abraham, and she does not know who created or sent that check document in her deposition. She admits she doesn't know who did that. It's a Stanley Foe check. It's a Stanley Foe check, the check, yes. That document underneath it. It wasn't forged. It wasn't fraudulent. It came from Stanley Foe. Right, that check did. And Stanley Foe received no benefit. Again, that's on the behalf of Standard. What benefit does Stanley Foe get by sending these outside that tri-state region? Absolutely none. No benefit. So what are the totality of circumstances factors? We don't know. How can you say that? Oh, because Doreen testified, not one customer contacted him. He got no customers, nothing from that. He heard from nobody. What if, though, he would have gotten Sears Roebuck as a client out of Hoffman Estates, and they bought 10 million tons of foam, you know, that potentially he could have benefited greatly. But he received no benefit from this. So, I mean, he was not, well, again, they were looking for the tri-state. They were sent beyond that, and the question was, well, was it on our behalf? No, and we got no benefit from it. Does the statute require that a benefit be received? No, no. Thank you, Chuck. Okay. That's all I have unless you have more questions. I say that with trepidation. Thank you. We appreciate the level of preparation by the attorneys for both sides of the briefing. It was excellent, and we appreciate your efforts this morning. This matter will be taken under advisement. Thank you. Thank you.